To the clerk of the court:
Honorable Brendan L. Shannon.    Case no. 17-12560    Adv. Proc. 19-50315 BLS

Dear Sir:   Michael and Joyce Skurich are asking the Court to order anyone representing Woodbridge, Pachulski Stang Ziegler Jones, including Jayson Pomerantz from contacting us. We have broken no laws or rules of the bankruptcy court. We are the so called whistleblowers that provided all of the evidence and paper work to the Colorado Division of Securities and the Colorado Attorney Generals Office to shut down Woodbridge, Robert and Jeri Shapiro, and all related business, real estate operations in Carbondale, Aspen Glen, and the whole state of Colorado. We protected all future victims from Woodbridges scams. We started by issuing a " Order To Show Cause " directed to Woodbridge Group on October 12, 2017. ( I am encloseing a copy of Case No. 2017-CDS-052). Our testament is on page 7&8 of the order. We continued to give more important information to the investigators until the final cease and desist order was signed delivered on May 15, 2018. Case No. 2017 0005 - 0006

After the order to show cause on October 12, 2017 Woodbridge and all of its employees found out we were the whistleblowers and had agreed to testify against Woodbridge, we started to get death threats like: ( " Your Rats" ) we kill rats, "Keep your mouths shut or we will shut them" and one guy screaming in the phone "Thanks Asshole- You will get yours".  We reported this all to the Sheriff and the F.B.I., including when someone beat on our door at 1:30 am and ran to a white 4 door sedan.

We were asked on February 14, 2017 by a investigator if we would help on this case and we said we would fully cooperate with them if we didn't brake and laws and they would protect us from any reprisals or harm from Woodbridge. They said that they would and there are laws that protect whistleblowers..

We have been told by the Attorney Generals Office, the Division of Securities Office and 2 attorneys that we haven't broken any bankruptcy laws or rules, no state laws, and no Federal laws and not to worry because we will be protected from anyone trying to harm us..

We had no "90 day transfers " no "Net Winnings". no "Fraudulent Transfers "

We helped the Colorado authorities until the end and gave them all the information we had. They thanked us for our cooperation.

Judge, we don't believe we should be held liable or punished for helping the authorities get rid of Woodbridge in Colorado. We followed the law and broke no rules.

Please help us..... At our age we shouldn't have to sleep with a gun and be afraid to open our door at night.

We did what we thought was the right thing to do.. What do you think?

   This is the timeline:

August 4, 2016.  - Gave Woodbridge $200,000 ( our retirement funds)
August. 22, 2016 - 1st interest check
August 22, 2017 - Last interest check
August 30, 2017 - Woodbridge returned our $200,000
September 5, 2017 - Released collateral assignment of first position lien
September 5, 2017 - 90 days before bankruptcy
February 14, 2017 - The Colorado Division of Securities and the Attorney Generals Office contacted us and asked for our help in there case against Woodbridge
October 12, 2017 - Colorado filed the Order to Show Cause case against Woodbridge Group and others.  Case No. 2017-CDS-052.  We enclosed a copy for you..
December 4, 2017 - Woodbridge filed bankruptcy
October 26, 2018 - the "Plan" effect date
April 13, 2018 - Bradley Sharp signed cease and desist order for Woodbridge
May 15, 2018 - Woodbridge final cease and desist order ( case over)
In between:   August 2017. &. December 2017.
      Death threats and harassment

Enclosed are the two other letters and answers to complaints..
Thank you for your time And hearing our side of the case...         *[signature: Michael Skurich]*

Michael and Joyce Skurich.    Date SEPT 29, 2020

BEFORE THE SECURITIES COMMISSIONER

STATE OF COLORADO

Case No. 2017-CDS-044 52
OAC Case No. XY20170005

## CONSENT CEASE AND DESIST ORDER

IN THE MATTER OF WOODBRIDGE GROUP OF COMPANIES, LLC *et al.*, TIMOTHY C. MCGUIRE, RONALD E. CASKEY, and JAMES E. CAMPBELL, JR.

Respondents.

THIS MATTER is before Gerald Rome, Securities Commissioner for the State of Colorado ("Commissioner"), on the Stipulation for Consent Order ("Stipulation") between the Staff of the Colorado Division of Securities ("Staff") and Respondent Timothy C. McGuire. After reviewing the Stipulation and grounds therein, the Commissioner makes the following Findings and enters the Order as follows:

### FINDINGS

1. The Commissioner has jurisdiction over the Respondent and this matter pursuant to the provisions of the Colorado Securities Act, §§ 11-51-101 through 803, C.R.S.

2. By entering into the Stipulation, Respondent has waived the following rights: (1) to have a formal hearing pursuant to §§ 11-51-606(1) and (1.5), C.R.S.; (2) to be represented by counsel in that action; (3) to present a defense through oral or documentary evidence; (4) to cross-examine witnesses at such hearing; (5) to findings by the Securities Commissioner as required by § 11-51-606(1.5), C.R.S; and (6) to seek judicial review of the Consent Order as provided in §§ 11-51-607 and 24-4-106, C.R.S.

3. Respondent has further waived the findings required by § 11-51-606(1.5)(d)(IV) and does not contest that pursuant to § 11-51-704(2), C.R.S., entry of this Consent Order is necessary and appropriate in the public interest and is consistent with the purposes of the Colorado Securities Act.

4. The Commissioner acknowledges by entering into the Stipulation that Respondent neither admits nor denies that any of the allegations enumerated

in Part I of the Stipulation, except to the extent they are included among the stipulations in Part II of the Stipulation, are true.

## ORDER

NOW, THEREFORE, on the basis of the foregoing, it is hereby ORDERED as follows:

1. The Respondent, his officers, directors, agents, employees, and servants, or any person who, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under the common control with Respondent, who receive actual notice of this Order by personal service or otherwise, are hereby immediately and permanently ordered to cease and desist from engaging in any of the following acts:

    a. Offering or selling unregistered securities in or from the State of Colorado in violation of §§ 11-51-301, C.R.S., *et seq.*, or

    b. Offering to sell or selling any security in or from the State of Colorado unless the Respondent is in compliance with the provisions of §§ 11-51-301, 401, and 501, C.R.S., or

    c. Otherwise engaging in conduct in violation of any provision of the Colorado Securities Act, §§ 11-51-101, C.R.S., *et seq.*

2. The terms of the Stipulation are incorporated into and made a part of this Consent Cease and Desist Order.

3. McGuire shall immediately and permanently cease marketing and selling interests in the FPCM Note Program in Colorado.

4. The Commissioner shall retain jurisdiction over this action to ensure Respondent's compliance with this Order and reserves the power to enter additional orders as needed to ensure the compliance by the Respondent with this Order.

5. In the event Respondent fails to comply with any of the terms or conditions for this Consent Order or the Stipulation, the Commissioner or the Staff, in their sole discretion, may initiate formal enforcement proceedings against Respondent for such noncompliance. The Stipulation and this Consent Order shall be admissible in any such proceeding.

6. This Consent Order, and the terms and conditions herein, shall be binding on all successors and assigns.

DATE: *February 16*, 2018

_____
GERALD ROME
Securities Commissioner

[seal]

BEFORE THE SECURITIES COMMISSIONER

STATE OF COLORADO

Case No. 2017—CDS—052

RECEIVED

17 OCT 12 PM 2: 15

OFFICE OF
ADMINISTRATIVE COURTS

---

**VERIFIED PETITION FOR ORDER TO SHOW CAUSE DIRECTED TO WOODBRIDGE GROUP OF COMPANIES, LLC *et al.*, TIMOTHY C. MCGUIRE, RONALD E. CASKEY, and JAMES E. CAMPBELL, JR.**

---

IN THE MATTER OF WOODBRIDGE GROUP OF COMPANIES, LLC *et al.*, TIMOTHY C. MCGUIRE, RONALD E. CASKEY, and JAMES E. CAMPBELL, JR.

Respondents.

---

TO:

Woodbridge Group of Companies, LLC
Woodbridge Mortgage Investment Fund 1, LLC
Woodbridge Mortgage Investment Fund 2, LLC
Woodbridge Mortgage Investment Fund 3, LLC
Woodbridge Mortgage Investment Fund 3A, LLC
14140 Ventura Blvd., Suite 302
Sherman Oaks, CA 91423

Timothy C. McGuire
9698 Dunning Circle
Highlands Ranch, CO 80126

James E. Campbell, Jr.
314 High View Circle
Woodland Park, CO 80863

Ronald E. Caskey
9035 Owl Lake Dr.
Firestone, CO 80566

The Staff of the Colorado Division of Securities ("Staff") hereby petitions the Securities Commissioner to enter an order directing Respondents to show cause why a final cease and desist order should not be issued against them, and as grounds states the following:

## JURISDICTION

1. Pursuant to § 11-51-703, C.R.S., the Securities Commissioner is authorized to administer and enforce all provision of the Colorado Securities Act (the "Act").

2. Pursuant to § 11-51-606(1.5)(a), C.R.S., whenever it appears to the Securities Commissioner, based on sufficient evidence presented in a petition by an officer or employee of the Division of Securities, that a person has committed or may

1

commit any of the acts or practices enumerated in § 11-51-606(1.5)(b), C.R.S., the Securities Commissioner may issue an order to such person to show cause why a final order should not be entered by the Securities Commissioner directing such person to cease and desist from the acts or practices which constitute alleged violations of the Act, or to impose such other sanctions as may be appropriate.

3. The Securities Commissioner may act under § 11-51-606(1.5)(a), C.R.S. when it appears that any person has engaged or is about to engage in any other act or practice in violation of § 11-51-401 or any rule or order under such section. § 11-51-606(1.5)(b)(II), C.R.S. The Securities Commissioner may act under § 11-51-606(1.5)(a), C.R.S., when it appears that any person has engaged or is about to engage in any other act or practice in violation of § 11-51-501 or any rule or order under such section. § 11-51-606(1.5)(b)(III), C.R.S.

## RESPONDENTS

4. Woodbridge Group of Companies and Woodbridge Mortgage Investment Funds 1, 2, 3, and 3A are Delaware limited liability companies with a last known address of 14225 Ventura Blvd., Suite 100, Sherman Oaks, CA 91423. The registered agent for these Respondents is: A Registered Agent, Inc., 8 The Green, Suite A, Dover, DE 19901.

5. Woodbridge Fund 1, Woodbridge Fund 2, Woodbridge Fund 3, and Woodbridge Fund 3A may be referred to collectively as "the Woodbridge Funds." Woodbridge Group of Companies and the Woodbridge Funds may be referred to collectively as "the Woodbridge Companies."

6. James E. Campbell, Jr. is an adult male whose last known address is 314 High View Circle, Woodland Park, CO 80863. Campbell is the Registered Agent for Campbell Financial and was formerly licensed as an investment adviser representative with the State of Colorado until 2013. At all times relevant to these allegations, Campbell acted as an independent Woodbridge sales agent through Campbell Financial, where he still serves as President and Control Person.

7. Timothy C. McGuire is an adult male whose last known address is 9698 Dunning Circle, Highlands Ranch, CO 80126. McGuire is the Registered Agent, President, and Control Person for Better Returns, LLC, a Colorado limited liability company.

8. Ronald E. Caskey (CRD # 5574207) is an adult male whose last known address is 9035 Owl Lake Dr., Firestone, CO 80566.

## GENERAL ALLEGATIONS

9. An investigation by the Staff revealed that Respondents Woodbridge Companies, Campbell, McGuire, and Caskey have offered or are offering for sale securities in the form of Respondent Woodbridge's First Position Commercial Mortgage (FPCM) Note Program.

10. To promote sales for the Note Program, Respondents are using internet pages accessible in Colorado as well as direct radio marketing techniques that target Colorado residents. One such page is: www.woodbridgewealth.com.

11. Woodbridge has received favorable publicity for its Note Program through the positive recommendations of author and speaker Jordan Goodman when he was a regular guest on the Dave Rosen radio program on KOA 850 AM. Other Front Range talk radio programs have advertised the Note Program without specifically referencing Woodbridge.

12. Respondent McGuire, through Better Returns, LLC, has placed ads in the Denver Post classified section in an attempt to attract investments in the Note Program. Respondent Campbell has also placed similar ads.

### The Note Program

13. The Woodbridge Funds are commercial lenders that make hard-money loans secured by commercial property. The Woodbridge Funds raise money from investors to help fund the hard-money loans. The Woodbridge Companies refer to these securities as "First Position Commercial Mortgages" (FCPM). The Woodbridge Funds advertise that their management teams' substantial experience lets them maintain a successful lending model and find lending opportunities that are favorable for investors. Investors do not have any role other than providing money.

14. An FPCM consists of a promissory note from a Woodbridge Fund, a loan agreement, and a non-exclusive assignment of the Woodbridge Fund's security interest in the mortgage for the underlying hard-money loan. The Woodbridge Funds pool money from multiple investors for each hard-money loan. The Woodbridge Funds' promissory notes effectively guarantee the underlying hard-money loans, and the Woodbridge Funds' advertising materials state that the Woodbridge Funds are obligated to make payments to FPCM investors even if the hard-money borrower defaults.

15. An FPCM is a security as that term is defined under §11-51-201(17), C.R.S. in that it is at least "any note" or an "investment contract."

16. FPCMs involve risks that are typically associated with real estate investments. An investor might need to sue the Woodbridge Fund or the third party hard-money borrower to recover the investment. The value of the real estate collateral for the hard-money loan might be too low due to depreciation or the Woodbridge Funds' failure to properly value it. If the real estate does not adequately collateralize the loan, the Woodbridge Funds may fail to maintain enough liquid cash reserve to continue making payments to the investor. And the investor's security interest in the real estate collateral could be invalidated by the Woodbridge Funds' failure to properly perfect the security interest (collectively "Risks").

17. On May 4, 2015, Woodbridge Fund 1, Woodbridge Fund 2, and Woodbridge Fund 3 consented to an order by the Massachusetts Securities Division (the "Massachusetts Order"). The Massachusetts Order found that the FPCMs are securities and that Woodbridge Fund 1, Woodbridge Fund 2, and Woodbridge Fund 3 had violated the Massachusetts Uniform Securities Act by selling unregistered securities. The Massachusetts Order also required them to offer rescission to Massachusetts investors and to pay a civil penalty of $250,000.

18. On July 17, 2015, the Texas State Securities Board issued an emergency cease and desist order (the "First Texas Order") against Woodbridge Fund 3, Woodbridge President Robert Shapiro, and other parties that ordered them to stop engaging in fraud in connection with the sale of securities in Texas. The Texas Order alleged that the FPCMs are securities and alleged that Woodbridge Fund 3 and Shapiro were engaging in fraud in connection with the sale of securities by failing to disclose the Massachusetts Order and various investment risks to potential investors.

19. On March 18, 2016, Woodbridge Fund 3 and Shapiro consented to an order by the Texas State Securities Board (the "Second Texas Order"). The Second Texas Order found that Shapiro was the controlling person of Woodbridge Fund 3, concluded that the FPCMs were securities, and concluded that Woodbridge Fund 3 and Shapiro violated the Texas Securities Act by offering unregistered securities. Shapiro consented to the order on behalf of Woodbridge Fund 3 as its controlling person.

20. The Woodbridge Companies sell the FPCMs through unregistered sales representatives located in Colorado.

### Woodbridge's unlicensed sales representatives have sold and continue to sell unregistered securities in Colorado.

21. From October 2013–September 2016, information provided by the Woodbridge Companies to the Staff substantiates that Woodbridge, through its

sales representatives, sold approximately $57,000,000 worth of interests in the Note Program to roughly 450 Colorado investors.

22. Woodbridge made these sales to Colorado investors using at least ten other sales representatives, none of whom were licensed to sell securities in Colorado.

23. Both the Woodbridge Companies and their unlicensed sales agents are continuing to offer and sell interests in the Note Program to Coloradans.

24. The Woodbridge Notes have not been registered and are not exempt from registration.

### Colorado Investors

### E.A.

25. E.A. is an 80-year-old adult male who resides in Lake George, CO.

26. Campbell contacted E.A. by telephone in 2014 and offered to sell him an interest in the Note Program.

27. In July 2014, E.A. invested $100,000 in Woodbridge Mortgage Investment Fund 2, LLC, which promised to pay a 7% return. In August 2014, E.A. invested another $50,000 in Woodbridge Mortgage Investment Fund 2, LLC, also for a 7% return. Campbell was the agent for both transactions and received commissions.

### R.N. and B.N.

28. R.N. is an 85-year-old adult male who resides in Loveland, CO with his spouse, B.N., who is 84 years old.

29. In early 2015, R.N. was looking for an investment that provided regular returns and safety of principal.

30. Through word of mouth, R.N. and B.N. attended a dinner at Nordy's in Loveland where Caskey spoke on financial planning matters.

31. Approximately four months after the dinner, R.N. contacted Caskey and invited him to their house to discuss investment options. R.N. did not purchase any products from Caskey on the first visit. Caskey visited on several other occasions. Later, R.N. decided to invest.

32. On or around February 9, 2015, R.N. invested $25,000 in Woodbridge funds in order to receive a 6% return. On or about December 5, 2015, R.N. invested

another $40,000, also expecting a 6% return. On or around May 9, 2017, R.N. agreed to invest another $25,000. Having combined the previous $25,000 with this investment, R.N. agreed to extend his $50,000 loan out five years in exchange for a 10% return.

33. R.N. continues to receive monthly interest payments from Woodbridge.

### W.D. and L.D.

34. W.D. is an 82-year-old adult male, semi-retired Certified Public Accountant who resides in Denver, CO with his wife, L.D., who is 80 years of age. W.D. first heard of Woodbridge by listening to Jordan Goodman on the Rosen radio show on 850 AM. W.D. stated that Goodman is popularly known as "America's Money Answer Man."

35. W.D. called Woodbridge based on Goodman's on-the-air advice and spoke with a sales representative. On or about December 1, 2014, the sales representative assisted him in making a $100,000 investment in Woodbridge Mortgage Investment Fund 3, LLC.

36. During his conversation with the sales representative but prior to investing, W.D. was provided with a list containing small photographs and brief descriptions of properties which were eligible for investment. The sales representative assisted W.D. in deciding on a property in Delaware known as the "Bora Bora Bundle – Fenwick Island, DE."

37. The Woodbridge sales representative provided W.D. with a set of documents common to all Colorado investors that included the note, a blank "Form of Assignment," and an additional blank "Form of Collateral Assignment" document.

38. W.D. stated that he knew virtually nothing about this investment property; he completely relied on the Woodbridge sales representative; and he received no deed of trust or documents of any kind substantiating the purchase at the time of tendering his money. Documents related to the investment did arrive a short time later by mail.

39. Prior to investing, W.D. requested company financial information from Woodbridge, but was told that Woodbridge did not give out income statements or prospectuses.

40. In December 2015, W.D. "rolled" his investment into a new property and continues to receive monthly interest payments from the Woodbridge Fund.

6

### D.S.

41. D.S. is an 86-year-old adult male who resides in Denver, CO. During his working career, D.S. sold both insurance products and securities as a licensed sales representative and financial planner. D.S. has been retired for 26 years.

42. On or about August 2, 2016, D.S. saw an ad in the Denver Post newspaper boasting a 6.0% annual rate of return for one year, paid monthly, through the Note Program. The ad stated that the investment was secured by "high-value commercial real estate." The offering company in the ad was "Better Returns."

43. D.S. was looking for an investment that emphasized regular returns and safety of principal.

44. D.S. called the number on the ad and spoke with an individual who identified himself as Timothy McGuire. McGuire asked to meet D.S. in person, and they agreed to meet at D.S.'s home.

45. While at D.S.'s residence, McGuire pitched his many years in the securities industry and the merits of the Note Program, saying the offering had practically no risk. McGuire provided very little information about the Woodbridge Companies themselves except for a hand-drawn diagram.

46. D.S. was impressed by McGuire's eloquence and appearance, but he regarded it as "strange" that, in response to his request to McGuire for detailed information about the Note Program and Woodbridge's company history, McGuire provided no prospectus. D.S. believed that the lack of detailed financials was a red flag.

47. D.S. told McGuire he wished to perform more due diligence before investing and ended the meeting.

48. After calling the Colorado Division of Securities to inquire about the Note Program, D.S. learned about McGuire's previous injunction. Ultimately, D.S. declined to invest in the offering.

### M.S. and J.S.

49. M.S. is a 75-year-old adult male who resides in Castle Rock, CO. M.S. and his wife, J.S., age 73, first heard of the Woodbridge Companies through Colorado Front Range talk radio programs. They also reported having seen the

Better Returns advertisement in the Denver Post offering FPCM notes for a minimum $25,000 investment and guaranteeing a 6% return.

50. On or about August 2016, M.S. called the number on the Better Returns ad and spoke with a party who identified himself as Tim McGuire, the president of Better Returns.

51. M.S. was seeking a safe investment that offered a better return than a money market or savings account in a financial institution.

52. McGuire explained the Note Program to M.S. and told him that the money would be used to renovate a commercial property in Los Angeles, CA. McGuire further stated that Woodbridge only lent half the appraised value of a particular property, so that in the event of a borrower's failure to make payments, Woodbridge could foreclose on the property and still have enough money to repay all lenders/investors.

53. M.S. agreed to meet with McGuire at a local restaurant in Castle Rock. After discussing the Note Program further, M.S. agreed to invest $200,000 in Woodbridge Mortgage Investment Fund 3A, LLC. However, McGuire gave M.S. very few details regarding the investment property.

54. M.S. subsequently received a Woodbridge Note, Loan Agreement, and related paperwork substantially similar to that received by D.S.

55. M.S. continues to receive $1,000 checks each month from Woodbridge.

56. On February 14, 2017, McGuire again solicited J.S. for an investment in the Note Program. J.S. told McGuire that they were not interested in making another investment in the Woodbridge Companies at that time.

### J.S.S. and K.S.

57. J.S.S. is a 73-year-old adult male who resides in Centennial, CO. J.S.S. first learned of Woodbridge through local radio programming in which both hosts and guests encouraged listeners to invest in the Note Program. He also reported having seen the Better Returns advertisement in the Denver Post, and it was on that basis that he contacted McGuire by telephone.

58. On or about August 2016, McGuire explained the Note Program to J.S.S. over the phone and then made an appointment to meet J.S.S. at his home in Centennial.

59.    Based on his discussions with McGuire, J.S.S. invested $100,000 in the Note Program. The property in question is located in Sherman Oaks, California. This is also the location of the Woodbridge Companies' principal place of business.

60.    On or about December 2016, McGuire also assisted J.S.S.'s wife, K.S., age 70, in making a separate investment of $50,000 pertaining to a property in Snowmass Village, CO

61.    J.S.S. and K.S. continue to receive monthly checks from Woodbridge.

## Woodbridge and its agents have misrepresented or omitted material facts to Colorado investors

62.    In connection with the offer, sale, or purchase of securities in Colorado, the Respondents the Woodbridge Companies, McGuire, Campbell, and Caskey, directly or indirectly made written and oral untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading in violation of § 11-51-501(1), C.R.S. Specifically, the fore-referenced Respondents omitted the following information:

    a. The identities and/or qualifications of the officers, directors, principals, persons and entities that control the Woodbridge Companies.

    b. The assets and liabilities of Woodbridge relevant to Woodbridge's ability to pay investors monthly returns and repay the principal investment.

    c. Risks that exist to interest and principal payments if Woodbridge fails to raise sufficient capital to collateralize prospective commercial loans.

    d. The failure to make any filing with the Colorado Securities Commissioner authorizing Woodbridge or Shapiro to carry out the Note Program in Colorado.

    e. The following enforcement actions taken by state securities regulators:

        1. The Massachusetts Order dated May 4, 2015.
        2. The First Texas Order dated July 17, 2015.
        3. The Second Texas Order dated March 18, 2016.

    f. The findings in the above-referenced enforcement actions that the FPCM notes are securities.

63.  In connection with the offer, sale, or purchase of the Note Program to D.S., M.S., and J.S.S., Respondent McGuire directly or indirectly made the following written or oral untrue statements of material fact:

   a. The Note Program has practically no risk.

   b. McGuire's clients benefit from his 32 years of experience in the securities industry.

64.  In making the aforementioned statements, Respondent McGuire omitted to state the following material facts:

   a. The states of Texas and Arizona had taken enforcement actions against Woodbridge for violating both states' securities laws.

   b. McGuire himself had been the subject of the following securities enforcement actions:

       a. On March 25, 2002, an Order of Permanent Injunction and Other Relief was entered against McGuire in *Joseph v. American Assets Mgmt. Corp. et al.*, Denver Dist. Ct. Case No. 2001CV002008. The Order permanently restrained and enjoined McGuire from offering or selling unregistered/non-exempt securities, as well as from committing securities fraud by failing to disclose material information to investors.

       b. On December 24, 2002, the Oregon Department of Consumer and Business Services entered a Cease and Desist Order against McGuire in the case *In the Matter of Timothy Colin McGuire and American Asset Management Corporation, Inc.*, Cause No. A-02-0029. The Order found that McGuire had sold unregistered securities, did not have a license to sell securities in Oregon, and had made misrepresentations or omissions of material of fact in connection with such sales. McGuire was ordered to pay a suspended civil penalty of $15,000.

## COUNT I
## Sale of Unregistered Securities
## § 11-51-301, C.R.S.

### All Respondents

65. The allegations contained in Paragraphs 1 through 65 are incorporated as though fully set forth herein.

66. Section 11-51-301, C.R.S., states: "It is unlawful for any person to offer to sell or sell any security in this state unless it is registered under this article or unless the security or transaction is exempted under section 11-51-307, 11-51-308- 11-51-308.5, or 11-51-309."

67. The fractional interests in the Note Program were neither registered with the Division of Securities nor exempted from registration when Respondents offered or sold them to Colorado investors. Accordingly, Respondents are in violation of § 11-51-301, C.R.S.

## COUNT II
## Sale of Securities by an Unlicensed Broker-Dealer or Sales Representative
## § 11-51-401(1), C.R.S.

### All Respondents

68. The allegations contained in Paragraphs 1 through 67 are incorporated as though fully set forth herein.

69. Section 11-51-401(1), C.R.S., states: "A person shall not transact business in this state as a broker-dealer or sales representative unless licensed or exempt from licensing under 11-51-402."

70. Section 11-51-102(1), C.R.S., provides that Section 401(1) "appl[ies] to persons who sell or offer to sell when an offer to sell is made in this state or when an offer to purchase is made and accepted in this state."

71. Section 11-51-201(2), C.R.S., defines a "broker-dealer" as "a person engaged in the business of effecting purchases or sales of securities for the accounts of others or in the business of purchasing and selling securities for the person's own account."

72. Section 11-51-201(14), C.R.S., defines a "sales representative" in relevant part as "an individual, other than a broker-dealer, [...] authorized to act and acting for a broker-dealer in effecting or attempting to effect purchases or sales of securities."

73. Respondents transacted business in Colorado by selling or attempting to sell fractional interests in the Note Program to Colorado residents.

74. By engaging in the conduct described above, Respondents are in violation of § 11-51-401(1), C.R.S., as they were not licensed in this state as a broker-dealer or sales representative, nor were they exempt from licensure.

## COUNT III
### Fraud
### § 11-51-501(1), C.R.S.

#### All Respondents

75. The allegations contained in Paragraphs 1 through 74 are incorporated as though fully set forth herein.

76. In connection with the offer, sale, or purchase of securities in Colorado to E.A., R.N., W.D., D.S., M.S., and J.S.S., the Respondents, directly or indirectly made written and oral untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading in violation of § 11-51-501(1), C.R.S.

77. By engaging in the conduct described above, Respondents offered and sold securities in violation of § 11-51-501(1), C.R.S., in that they did:

   a. Employ any device, scheme, or artifice to defraud;

   b. Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

   c. Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

## COUNT IV
### Sale of Securities using Unlicensed Sales Representative
### § 11-51-401(2), C.R.S.

#### Woodbridge

78. The allegations contained in Paragraphs 1 through 77 are incorporated as though full set forth herein.

79. Section 11-51-401(2), C.R.S., states: "Neither a broker-dealer nor an issuer shall employ or otherwise engage an individual to act as a sales representative in this state unless the sales representative is licensed or exempt from licensing under section 11-51-402(1)."

80. By engaging in the conduct described above, Respondent Woodbridge is in violation of § 11-51-401, C.R.S., as they engaged individuals to act as sales representatives in this state who were not licensed in this state, nor were they exempt from licensure.

WHEREFORE, the Staff respectfully requests the Securities Commissioner enter an order directing Respondents to show cause why a final order should not be entered by the Securities Commissioner prohibiting Respondents from offering and selling securities in Colorado, or, in the alternative, directing Respondents to cease and desist offering and selling securities in Colorado in violation of the Act, and for such other terms and conditions as the Securities Commissioner deems appropriate under §11-51-606(1.5)(d)(IV), C.R.S.

STAFF OF THE COLORADO
DIVISION OF SECURITIES

_____
LILLIAN ALVES
Deputy Securities Commissioner

Subscribed and sworn before me this 12th day of October, 2017 in the County/City of Denver, State of Colorado by Lillian Alves.

_____
Notary Public

My Commission Expires: 12/02/2018

LISA GUTIERREZ
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20144045775
MY COMMISSION EXPIRES 12/02/2018